# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MELISSA HAMAN,
    *Plaintiff*,

v.                                                     No. 3:17-cv-1752 (VAB)

NANCY A. BERRYHILL,
*Acting Commissioner of Social Security*,
    *Defendant*.

## RULING AND ORDER ON MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Melissa Haman ("Plaintiff") filed this administrative appeal under 42 U.S.C. § 405(g) against the Acting Commissioner of Social Security ("Defendant" or "the Acting Commissioner"), seeking to reverse the decision of the Social Security Administration ("SSA") denying her claim for Title II disability insurance benefits and Title XVI supplemental security income under the Social Security Act. Complaint, dated Oct. 18, 2017 ("Compl."), ECF No. 1.

Ms. Haman moves for a judgment on the pleadings reversing the decision of the Acting Commissioner. Motion for Judgment on the Pleadings, dated Aug. 26, 2018 ("Pl.'s Mot."), ECF No. 31; Memorandum in Support of Pl.'s Mot., dated Aug. 26, 2018 ("Pl.'s Mem."), ECF No. 31-1.

The Acting Commissioner moves for an order affirming her decision. Motion for an Order Affirming the Decision of the Commissioner, dated Oct. 29, 2018 ("Def.'s Mot."), ECF No. 32; Memorandum in Support of Def.'s Mot., dated Oct. 29, 2018 ("Def.'s Mem."), annexed to Def.'s Mot., ECF No. 32, at 2.

For the reasons explained below, Ms. Haman's motion is **GRANTED IN PART AND DENIED IN PART**. Her motion is granted with respect to the Acting Commissioner's Step Five finding, but denied with respect to the Acting Commissioner's Step Two finding. The Acting Commissioner's motion is **DENIED.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

Ms. Haman, who is now 48 years old, lives in Plantsville, Connecticut. Statement of Material Facts, dated Aug. 26, 2018 ("SMF"), ECF No. 31-2, ¶ 10; Transcript of Administrative Proceedings, filed Jan. 19, 2018 ("Tr."), annexed to Answer, filed Jan. 19, 2018 ("Ans."), ECF No. 15, at 57. She has a high school education and was previously employed as a receptionist and a sales clerk. SMF ¶¶ 11–12; Tr. 59–60. She alleges that she became disabled and unable to work on April 5, 2010. SMF ¶¶ 1–2; Tr. 12.

Ms. Haman suffers from several physical impairments: fibromyalgia, arthritis, and residual complications following a right ankle fracture. Tr. 15. She also suffers from several mental health conditions: depression, post-traumatic stress disorder ("PTSD"), and anxiety. *Id.* She also has a history of migraine headaches. *Id.*

On April 5, 2010, Ms. Haman fractured her ankle in three places, requiring an open reduction and internal fixation with screws, plates, and bolts. SMF ¶ 13. Since then, Ms. Haman has been out of the workforce. SMF ¶ 13. She lives alone in Plantsville in the same neighborhood as her parents, who she says live on the "next street" from her. SMF ¶ 16; Tr. 48, 58.

She now seeks review of the Acting Commissioner's denial of her applications for benefits under Title II and Title XVI.

### 1.    Medical Evidence

On April 5, 2010, Ms. Haman fell and fractured her right ankle. SMF ¶ 2. She was admitted to the Hospital of Central Connecticut at New Britain General, where she reported to physician's assistant Ryan Vicino that she had "tripped over the rug in her house and immediately had right knee and hip pain and right ankle pain," and that she had a medical history of anxiety, claustrophobia, panic attacks, and fibromyalgia. Tr. 600; *see also* Tr. 418–443. An x-ray revealed a right ankle fracture. Tr. 600–01. Dr. Frank Gerratano then operated on Ms. Haman, performing an open reduction and internal fixation of her right ankle with screws, plates, and bolts. Tr. 598–99; SMF ¶ 13. Ms. Haman was discharged from the hospital on April 6, 2010. Tr. 603.

On April 15, 2010, at a follow-up appointment at Grove Hill Medical Center ("Grove Hill"), Ms. Haman reported that she had some discomfort and was "incredibly anxious." Tr. 577. Physician's assistant Susan E. Benn, supervised by Dr. Gerratana, examined the incision site and found it "good without drainage or signs of infection." *Id.* Ms. Haman's sutures were removed, and her ankle had slight swelling and ecchymosis.[1] *Id.* X-rays taken that day showed the hardware to be in place with good alignment. *Id.* Ms. Haman's ankle was placed into a cam walker—a controlled ankle movement boot—and permitted to be toe-touch weight bearing with the assistance of crutches. *Id.*

On May 3, 2010, at follow-up appointment at Grove Hill, Ms. Haman reported she had been doing well but that she had a "new injury yesterday when she tripped and hit her right foot"

---

[1] Ecchymosis "is defined as '[a] purplish patch caused by extravasation of blood into the skin'—in other words, bruising." *Meng Meng Lin v. City of N.Y*, No. 16-cv-2270 (ERK)(PK), 2018 WL 4119207, at *2 n.1 (E.D.N.Y. Aug. 29, 2018) (internal citation omitted); *see also Batista v. Comm'r of Soc. Sec.*, No. 16-cv-3629 (KAM), 2018 WL 4964102, at *2 n.7 (E.D.N.Y. Oct. 15, 2018) ("Ecchymosis is '[t]he passage of blood from ruptured blood vessels into subcutaneous tissue, marked by a purple discoloration of the skin.'") (citation omitted).

while wearing her cam walker, and that she had increased pain since then and "felt a snapping sensation in her ankle." Tr. 576. Dr. Gerratana examined her and found some swelling and moderate restriction in motion, but that the internal hardware remained in place and that the fall did not appear to have disrupted the fracture. *Id.* Dr. Gerratana instructed her to continue to wear the cam walker. *Id.*

On June 3, 2010, at a follow-up appointment at Grove Hill, Ms. Haman reported continued ankle discomfort and stiffness. Tr. 575. Dr. Gerratana reported x-rays showed further healing of the fracture and instructed her to continue to wear the cam walker and an ankle ASO brace. *Id.*

On July 15, 2010, at a follow-up appointment at Grove Hill, Ms. Haman reported some discomforts in the right ankle. Tr. 574. Dr. Gerratana reported that Ms. Haman "walks with a limp," "has some weakness of right ankle dorsiflexion[2] without tenderness over the proximal fibula," "has good sensation of her foot," as well as "good motion of her right knee without effusion or instability." *Id.* He also reported x-rays showed the "healed trimalleolar fracture," but that her right knee was "unremarkable." *Id.* He instructed Ms. Haman to begin physical therapy to strengthen her ankle and ordered an EMG nerve conduction test to further evaluate her dorsiflexion weakness of the right ankle. *Id.*

On August 19, 2010, at a follow-up appointment at Grove Hill, Ms. Haman reported "improved motion and strength of her ankle." Tr. 573. Dr. Gerratana reported that she had "a moderate restriction of her ankle motion," "active dorsiflexion to the initial position," and "no

---

[2] "Dorsiflexion is the upward movement of the foot or toes, so that the toes are brought closer to the shin[.]" *Valerio v. Comm'r of Soc. Sec.*, No. 08-cv-4253 (CPS), 2009 WL 2424211, at *5 n.34 (E.D.N.Y. Aug. 6, 2009) (citing STEDMAN'S MED. DICTIONARY 775 (27th ed. 2000); *see also Rodriguez v. Astrue*, No. 12-cv-4103, 2013 WL 1282363, at *4 n.21 (E.D.N.Y. Mar. 28, 2013) ("Dorsiflexion is the '[u]pward movement (extension) of the foot or toes.'") (citation omitted).

neurovascular deficits of the foot," and advised that she would continue with her exercise program. *Id.*

On October 1, 2010, at a follow-up appointment at Grove Hill, Ms. Haman reported "some discomforts and weakness in the ankle." Tr. 572. Dr. Gerratana reported that she had "a mild restriction of right ankle dorsiflexion with some dorsiflexion weakness," "diffuse tenderness of the ankle," and "no neurovascular deficit," and that x-rays showed "union of the ankle fractures." *Id.* His impression was that she had a "healing fracture" and advised that she "will be allowed increased activities" and will "continue with physical therapy program." *Id.*

On December 2, 2010, at a follow-up appointment at Grove Hill, Ms. Haman reported that she has "greater motion of the ankle now." Tr. 571. Dr. Gerratana reported that she had "a mild to moderate restriction in motion," "dorsiflexion to the neutral position," and "no neurovascular deficit of the right leg." *Id.*

On March 4, 2011, at a follow-up appointment at Grove Hill, Ms. Haman reported "bilateral knee discomfort" and that "her symptoms are worse with activity and changes in the weather." Tr. 570. Dr. Gerratana reported that Ms. Haman "walks with a limp," that her "right ankle has dorsiflexion to 90°," and "no neurovascular deficit of the right leg." *Id.* He also found that her knees have "some diffuse tenderness," but "no knee effusion or instability." *Id.* X-rays of her knees revealed "no significant boney abnormalities except for some right knee diffuse osteoperosis." *Id.* Ultimately, his impression was that she has some "right ankle discomfort due to the residuals of her ankle fracture" and "some bilateral knee ache and some right knee diffuse osteoperosis." *Id.* He advised that she "will be allowed increased activities" and "take calcium supplements." *Id.*

On June 13, 2011, at a follow-up appointment at Grove Hill, Ms. Haman reported "some posterior right ankle discomfort." Tr. 569. Dr. Gerratana reported that Ms. Haman "walks with a limp," "has some mild swelling of her right ankle and some tenderness over the posterior tibial tendon and Achilles tendon," and a "slight decrease of her right ankle dorsiflexion." *Id.* X-rays of her right ankle showed the fracture "to be solidly united." *Id.* His impression was that she was "symptomatic from the residuals of her" fracture, "has some right ankle posterior tibial tendinitis," and "some bilateral knee discomfort, probably associated with some patellar chondromalacia."[3] *Id.* He supplied Ms. Haman with "heel lifts," advised her to continue her current medication, and planned to reassess her in three months. *Id.*

On September 12, 2011, at a follow-up appointment at Grove Hill, Ms. Haman reported "some posterior ankle discomfort as well as some bilateral knee discomfort," and that her symptoms are "worse with activity and weather changes." Tr. 568. Dr. Gerratana reported that her right ankle "has a mild restriction to motion, especially with dorsiflexion limitations," "some diffuse tenderness of the ankle," and "some tenderness" in her right Achilles tendon. *Id.* He also reported that her knees have "fairly good motion with some tenderness of the patellofemoral joints" and "no knee effusion or instability." *Id.* His impression was that she was "symptomatic from residuals of her right ankle fracture with some Achilles tendinitis" and that she "has bilateral patellar chondromalacia." *Id.* He supplied Ms. Haman with a "heel lift," advised her to continue her current medication, and planned to reassess her in three months. *Id.*

---

[3] "Chondromalacia patella is abnormal softening of the cartilage of the underside the kneecap (patella). It is a cause of pain in the front of the knee (anterior knee pain). Chondromalacia patella is one of the most common causes of chronic knee pain. Chondromalacia patella results from degeneration of cartilage due to poor alignment of the kneecap (patella) as it slides over the lower end of the thighbone (femur)." *Yaris v. Colvin*, No. 14-cv-551-JTC, 2016 WL 824446, at *5 n.5 (W.D.N.Y. Mar. 3, 2016) (citation omitted); *see also Rodriguez*, 2013 WL 1282363, at *6 n.42 ("Chondromalacia refers to the softening of cartilage.") (citation omitted); *Colvell v. Astrue*, No. 5:12-CV-0305 GTS/ATB, 2013 WL 2237839, at *8 n.4 (N.D.N.Y. May 21, 2013) ("Chondromalacia patella, is a general term indicating damage to the cartilage under the knee cap.").

On December 12, 2011, at a follow-up appointment at Grove Hill, Ms. Haman reported "some bilateral knee discomfort as well as some ankle discomfort" and that she is "seeing Dr. Anwar for fibromyalgia." Tr. 567. Dr. Gerratana reported that "she walks with a limp," "has a mild restriction of right ankle motion due to the residuals of her" fracture, and "has no neurovascular deficits of the right foot." *Id.* He also reported that she has a "mild restriction of knee motion with some patellofemoral joint tenderness and crepitus,"[4] but "no knee effusion or instability." *Id.* His impression was that she was "mildly symptomatic from the residuals of her right ankle fracture status post surgery" and has "bilateral knee pain due to patellar chondromalacia." *Id.* He advised her to continue "her knee rehabilitative exercises," noted that she "uses a heel pad," and planned to reassess her in three months. *Id.*

On March 12, 2012, at a follow-up appointment at Grove Hill, Ms. Haman reported "some right ankle and bilateral knee discomforts," and that her symptoms are "worse with increased activity." Tr. 566. Dr. Gerratana reported that "her right ankle has a moderate restriction in motion with some tenderness over the distal Achilles and posterial tibial tendon." *Id.* He also reported that her knees "have a mild restriction in flexion with some tenderness over the patellofemoral joints," and "no knee effusion or instability." *Id.* His impression was that she was "symptomatic from her patella chondromalacias as well as the residuals of her right ankle fracture and some tendinitis." *Id.* He prescribed her Zanaflex,[5] instructed her to "continue with some rehabilitative exercises," and planned to reassess her in two months. *Id.*

---

[4] "'Crepitus' refers to 'the grating of a joint, often in association with osteoarthritis.'" *Khan v. Comm'r of Soc. Sec.*, No. 14-cv-4260 (MKB), 2015 WL 5774828, at *3 n.6 (E.D.N.Y. Sept. 30, 2015) (citing *Crepitus*, STEDMAN'S MED. DICT. (28th ed. 2006); *see also Astolos v. Astrue*, No. 06-cv-678, 2009 WL 3333234, at *3 n.17 (W.D.N.Y. Oct. 14, 2009) ("Crepitus describes the grating sound produced by bone fragments that rub together from fractured bone.") (citation omitted).

[5] "Zanaflex, a skeletal muscle relaxant, relieves spasms." *Mercado v. Colvin*, No. 15 Civ. 2283 (JCF), 2016 WL 3866587, at *6 n.24 (S.D.N.Y. Jul. 13, 2016) (citation omitted).

On June 25, 2012, at a follow-up appointment at Grove Hill, Ms. Haman reported "some recurrent lower leg swelling that is more significant on the right which improves with rest." Tr. 565. Dr. Gerratana reported that she walked with a "slight limp," that her right ankle "has a mild restriction in motion with some diffuse tenderness," and that her right lower leg "has some mild swelling . . . without any significant tenderness except over the patellofemoral joint bilaterally." *Id.* His impression was that she was symptomatic "from her right ankle posttraumatic arthritis as well as some lower leg swelling possibly [due] to venous insufficiency." *Id.* He planned for her to have a "vascular consultation" and to reassess her in six weeks. *Id.*

On September 24, 2012, at a follow-up appointment at Grove Hill, Ms. Haman reported "right ankle discomfort as well as some bilateral knee pain." Tr. 564. Dr. Gerratana reported that she "walks with a limp," and that her right ankle "has a moderate restriction in motion with another 5° of dorsiflexion" as well as "some diffuse tenderness" and "tenderness over the posterior tibial tendon." *Id.* He found "no neurovascular deficits of the lower extremities." Her knees had "good motion, strength, and stability but there is tenderness over the patellofemoral joints." *Id.* His impression was that she was "symptomatic from her post-traumatic right ankle arthritis as well as some right posterior tibial tendonitis and bilateral chondromalacia patella." *Id.* He supplied her with bilateral heel lifts, advised her to continue her current medications, and planned to reassess her in three months. *Id.*

On January 4, 2013, at a follow-up appointment at Grove Hill, Ms. Haman reported "discomfort because of her knee arthritis." Tr. 562. Dr. Gerratana reported that her ankle "has a mild restriction in motion especially with dorsiflexion" and "some tenderness over the posterior tibial tendon." *Id.* Her knees had "mild restriction of flexion with some tenderness and crepitus over the patellofemoral joint." *Id.* His impression was that she had "posttraumatic right ankle

arthritis and patellar chondromalacia." *Id.* He advised her to continue with Flexeril, Motrin, and Tylenol, and to return to him "if new problems develop." *Id.* No subsequent documentation of appointments with Dr. Gerratana appears in the administrative record.

On June 26, 2014, licensed clinical social worker Sue Thomas at Bristol Hospital Counseling Center saw Ms. Haman for an initial assessment. Tr. 458–61. Ms. Haman reported depression, anxiety, and other medical issues. Tr. 458. Ms. Thomas diagnosed Ms. Haman with "generalized anxiety," noting that she "has been struggling with applying for disability based on her medical conditions and this has caused increased stress," as well as relationship issues with her significant other. Tr. 460. She recommended that Ms. Haman begin individual therapy. *Id.*

On July 17, 2014, Ms. Haman saw Ellen Babcock, a licensed marriage and family therapist at Bristol Hospital Counseling Center, and developed a master treatment plan. Tr. 462–63. They agreed that Ms. Haman would begin six months of individual therapy as needed with Ms. Babcock and medication management as needed with APRN Sue Wargo and Jeffrey Shelton, M.D.. *Id.*

On December 10, 2014, Dr. Max Lee Wallace, M.D. conducted an x-ray study of Ms. Haman's knees that was ordered by Dr. Formica . Tr. 410–12. Dr. Wallace noted a "very early trace superior pole patella osteophyte formation," Tr. 411, but otherwise concluded it was an "unremarkable study." Tr. 410.

On January 29, 2015, Ms. Haman saw Dr. Christopher K. Manning, M.D. for an initial visit with chief complaints of fibromyalgia and depressive disorder. Tr. 465–66. Dr. Manning wrote that Ms. Haman "presents today with what I believe is probably more of a dysthymic condition than true fibromyalgia." He elaborated:

> She does have generalized pain and probable resulting persistent
> headaches but she does not have irritable bowel syndrome or any of

the other classic symptoms of fibromyalgia. What is most evident Is that she has had long-standing chronic and at times uncontrolled anxiety with a depressive component, She has failed or mostly been intolerant to so many different SSRIs, Cymbalta, Lyrica, Neurontin, Xanax and has only been able to tolerate Klonopin. When I have seen cases like this is almost always because of underlying significant psychiatric disease. Flexeril seem to give her some benefit for [a] number of years but then stop[ped] working. She may have actually gotten more of an antidepressant effect from that drug. She states that she's here to see me more specifically to two bilateral hand pain and swelling and although her fingers were generally tender and may be slightly swollen this is not synovitis and maybe more mild edema. With CMC joint involvement this could be early osteoarthritis. Her recent negative rheumatologic studies support a noninflammatory process. She is not having symptoms to support carpal tunnel syndrome. I went on to have a longer conversation with her and her mother about all of these issues in a strongly suggested that she get in to be seen and maybe treated by psychiatry since I believe this is what's likely fueling her pain syndrome, She wanted us to get involved in doing disability paperwork since this is her third time filing for Social Security disability but I explained to her that we no longer to form completion and I think she's going to end up staying with her current rheumatologist for that reason alone, I agreed to try calling in a different muscle relaxant [for] her but her insurance was already denying the soma prescription and I'm not sure what they will cover. I don't think will end up seeing her back unless things change.

Tr. 465–66.

On April 4, 2015, consultative examiner Gil Freitas, M.D. examined Ms. Haman. Tr. 495–97. He found that her "ambulation is slightly difficult," but that she had "no difficulties getting on and off the exam table," "getting out of the chair," or "dressing herself." Tr. 496. He observed that she used a cane, which she stated was "for stability due to her weakness in her ankle." Tr. 497. He found that her knee range of motion was normal in all direction. *Id.* He also found that her right ankle dorsiflexion was 15 degrees, planar flexion was 130 degrees, and internal rotation on the right and left was 20 degrees. *Id.* He also observed that she was unable to walk on her heels, to squat, or to walk on her toes due to her inability to move her right ankle. *Id.*

He also observed that her ankle was swollen, that she had 2+ edema to the middle lower leg, and that she had 3/5 strength on the right lower extremity and ankle region. *Id.* His overall impression was that she had a decreased range of motion in her right ankle, needed her cane for ambulation, and would have limitations in her ability to stand and walk for a long period of time. *Id.*

On April 8, 2015, consultative examiner and psychologist Marc Hillbrand examined Ms. Haman. Tr. 491–93. He generally observed that her "gait is slow," that she "walks with a cane" and "has difficulty climbing stairs," and that she had "mild psychomotor retardation." Tr. 491. Overall, he found Ms. Haman "alert and oriented in all spheres," noting that she "may have some slight concentration problems" but "was able to repeat five digits forward, but only three backward," and that it "took one trial for her to repeat four words immediately" and that "after 10 minutes, she remembered all four." Tr. 492. He concluded her "verbal and nonverbal reasoning abilities" appeared intact," and found "no evidence of a cyclical mood disorder, psychotic disorder, or severe cognitive disorder." *Id.*

Ms. Haman reported that she had "daily dysphoric thought content with prominent irritability" and "passive suicidal ideation." *Id.* She also "endorsed depressogenic cognitions" and reported "a frequency of panic attacks of one every few months." *Id.* With respect to daily activities, Ms. Haman reported that she "can perform hygiene tasks autonomously and never neglects those," that she "does household chores," "avoids leaving the house," and "spends most of her time at home." *Id.* She also reported that she drives, "although never further than about 10 minutes" from her home," and that she manages her finances and has a small social support network. *Id.* Dr. Hillbrand's diagnostic mental health impressions were: posttraumatic stress disorder, chronic; panic disorder without agoraphobia; and major depressive order, moderate. Tr.

492–93. Ultimately, he concluded that "she has struggled for years with posttraumatic stress and panic disorder symptoms and has more recently become depressed," and that these factors "adversely impact her functional capacity." Tr. 493.

On July 10, 2015, licensed clinical social worker Deborah Siegel at Bristol Hospital Counseling Center prepared a transfer/discharge summary report. Tr. 501. The report states that Ms. Haman's previous therapist, Ms. Babcock, had retired, and that Ms. Haman met briefly with Ms. Siegel for therapy "but reported stability and has been having her medications prescribed elsewhere for some time." Tr. 501. As a result, Ms. Siegel reported her discharged from therapy at Bristol Hospital Counseling Center. *Id.*

On January 15, 2016, consultative examiner Marc Hillbrand examined Ms. Haman again. Tr. 538–40. Compared with her prior visit, he concluded that her symptoms of PTSD had "become less severe over the time," but that her panic disorder "appears to have worsened over time and now includes agoraphobia." Tr. 540. He also found that her "ability to comprehend, retain and carry out simple tasks is mildly impaired," that her "ability to comprehend, retain, and carry out complex tasks is moderately impaired," and that her "ability to interact appropriately with supervisors, coworkers, and the general public is moderately impaired." *Id.*

On June 21, June 28, September 8, September 13, and September 27 of 2016, Ms. Haman was treated by licensed clinical social worker Harold Fischer at Connecticut Behavioral Health Associates, P.C. in Southington, Connecticut, for anxiety and depression. Tr. 556, 555, 554, 553, 552. On October 18, November 1, November 8, and November 30 of 2016, Ms. Haman was treated by Donnalee O'Connell for anxiety and depression. Tr. 551, 550, 549, 548.

On December 9, 2016, Dr. Phil Watsky, M.D.,[6] completed a set of interrogatories as to

Ms. Haman as requested by her attorney. Tr. 541–45. He reported that he had been treating Ms.

Haman since 1999. Tr. 541. He indicated that Ms. Haman's fibromyalgia was characterized by

widespread pain, fatigue, and sleep disruption, that her complaints were consistent with clinical

findings, and that she suffers from a number of somatic symptoms[7] including muscle pain and

weakness, chronic fatigue syndrome, anxiety disorder, and migraine. Tr. 542–43. He further

indicated that her fibromyalgia symptoms vary in severity from day to day, that she experiences

hand pain and swelling 3 or more days per week, and that her symptoms do not overlap with

symptoms from other conditions. Tr. 543–44. Overall, he indicated that fibromyalgia has been

present by history and consistent with physical examinations since April 14, 2010.[8] Tr. 544.

On December 21, 2016, Nicholas B. Formica, M.D., a specialist in rheumatology,

completed a set of interrogatories as to Ms. Haman as requested by her attorney. Tr. 557–61. He

---

[6] While no first name for Dr. Watsky appears in these interrogatories, the exhibit list for ALJ Thomas's 2013 decision provides his first name. Tr. 115.

[7] "Somatization is 'the expression of mental phenomena as physical (somatic) symptoms.'" *Fagner v. Berryhill*, No. 14-cv-6569, 2017 WL 2334889, at *4 n.2 (W.D.N.Y. May 30, 2017) (citation omitted). The SSA "recognizes two sets of criteria for diagnosing fibromyalgia, either of which can support a physician's opinion that the impairment was present." *Campbell v. Colvin*, No. 5:13-cv-451 (GLS/ESH), 2015 WL 73763, at *5 n.17 (N.D.N.Y. Jan. 6, 2015) (citing SSR 12–2p (2012)). "Essential to both sets of criteria are (1) findings of widespread pain, 'that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)-that has persisted (or that persisted) for at least three months,' and (2) evidence that other disorders that could cause the symptoms and signs had been excluded. The first set of criteria, based upon the 1990 ACR Criteria for the Classification of Fibromyalgia, further requires the finding of 'at least 11 [out of 18 designated] positive tender points on physical examination,' which must be found bilaterally and both above and below the waist. The second set of criteria, based upon the 2010 ACR Preliminary Diagnostic Criteria, requires 'repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome.' Under this second diagnostic method, 'signs' include certain 'somatic symptoms.'" *Id.* (citing SSR 12–2p (2012)).

[8] The administrative record before the Court does not contain any treatment notes or other opinions rendered by Dr. Watsky. Such evidence was considered by ALJ Thomas in his 2013 decision. Tr. 107. ALJ Thomas noted that treatment notes from Dr. Watsky "indicate that she had a fibromyalgia diagnosis dating back to 2001." *Id.* ALJ Thomas also noted that Dr. Watsky examined Ms. Haman on August 12, 2011, found that she had "multiple tender points and edema," and prescribed her Cymbalta for her fibromyalgia. *Id.*

reported that he had been treating Ms. Haman since 2011 and that she had 27 visits with him.[9]

Tr. 557. He indicated that Ms. Haman's fibromyalgia was characterized by widespread pain,

fatigue, and sleep disruption, that her complaints were consistent with clinical findings, and that

she suffers from a number of somatic symptoms including muscle pain, muscle weakness,

nausea, chest pain, diarrhea, anxiety disorder, and migraines. Tr. 558–59. He further indicated

that her fibromyalgia symptoms vary in severity from day to day over time, that she experiences

hand swelling and hand pain three or more days per week. Tr. 559. He noted, however, that her

symptoms "overlap with symptoms from other conditions." Tr. 560. Overall, he indicated that

fibromyalgia has been present by history and consistent with physical examinations since April

14, 2010. *Id.*

## 2.    First Set of Proceedings Before the SSA

Ms. Haman first filed an application for disability insurance benefits on August 9, 2011,

claiming a disability onset date of August 11, 2012. *See Gordon v. Colvin*, No. 3:14-cv-1348

(VLB), 2017 WL 822796, at *1 (D. Conn. Mar. 2, 2017). That application was denied, and was

ultimately denied by Administrative Law Judge James E. Thomas on February 19, 2013. *Id.* at

*8; Tr. 100–116.

On July 21, 2014, the Appeals Council of the SSA denied Ms. Haman's request for

review of ALJ Thomas's decision. Tr. 117–19.

---

[9] The administrative record before the Court does not contain any treatment notes or other opinions rendered by Dr. Formica. Such evidence was considered by ALJ Thomas in his 2013 decision. Tr. 109–10. ALJ Thomas noted that in an October 12, 2012 Medical Letter, Dr. Formica reported that Ms. Haman "had a significant case of fibromyalgia," and that she "experienced numerous fibromyalgia exacerbations with symptoms of pain and tenderness in her muscles diffusely," but that she was "unable to take may of the medications available for treatment due to insurance issues." Tr. 109–10. ALJ Thomas further noted that Dr. Formica opined that Ms. Haman was "not a candidate for employment of any kind at that time due to her chronic pain and poor concentration," and that her exacerbations "are not predictable and the duration of a flare up of her symptoms can last up to 7–10 days." Tr. 110. ALJ Thomas afforded little weight to Dr. Formica's opinion, which he found was not supported by treatment notes or the consultative examinations. *Id.*

On September 16, 2014, Ms. Haman appealed ALJ Thomas's decision. Complaint, dated Sept. 16, 2014, No. 3:14-cv-1348 (VLB), ECF No. 1.

On March 2, 2017, United States District Judge Vanessa L. Bryant denied Ms. Haman's motion to reverse the Commissioner's decision and granted the Commissioner's motion to affirm. *Gordon*, 2017 WL 822796, at *1, *18.

### 3. Second Set of Proceedings Before the SSA

On January 26, 2015, Ms. Haman filed a new application for disability insurance benefits. SMF ¶ 1; Tr. 280. On January 28, 2015, Ms. Haman filed an application for social security income. SMF ¶ 2; Tr. 284. In both applications, Ms. Haman alleged being disabled since April 5, 2010. SMF ¶¶ 1–2; Tr. 280, 284.

Her applications were first denied on May 4, 2015, and then denied again upon reconsideration on January 25, 2016. SMF ¶¶ 3–4; Tr. 189, 200, 213.

On January 28, 2016, Ms. Haman requested a hearing before an Administrative Law Judge. SMF ¶ 5; Tr. 232. On February 8, 2016, the SSA granted her request. Tr. 234.

On February 13, 2017, the SSA held a hearing on Ms. Haman's applications in Hartford, Connecticut. SMF ¶ 6; Tr. 48–95. Ms. Haman appeared, represented by counsel, before Administrative Law Judge ("ALJ") Louis Bonsangue. Tr. 50. Dennis King, an impartial vocational expert, also appeared, by telephone. *Id.*

Ms. Haman testified that she had a high school education and that she had worked at Southington Glass Company, answering telephones and doing showroom sales, from 2002 to 2010. Tr. 59–60. She explained that she fell on April 5, 2010, broke her ankle in three places, and had to have hardware installed the fracture. Tr. 61. She testified that she "walk[s] with a limp all the time" because she gets "fluid" in her right lower leg "every day." While she takes Lasix to

help reduce the fluid buildup, it "doesn't always" work, so there are "some days" that she feels like she has "a ten-pound bag of water" on her leg. Tr. 62. Since her 2010 fall, she walks with a limp, uses a cane, and can no longer walk in a straight line. Tr. 62–63. In her house, she says she uses the cane "three-quarters of the time." Tr. 64. She lives alone in a ranch house and that if she ever needs anything from her basement, her father will come over and bring it up for her. Tr. 64.

With respect to her anxiety and panic attacks, Ms. Haman testified that she experienced her first panic attack when she was fifteen years old, and that, since 2010, she gets them approximately five or six days a week. Tr. 68–69. She takes Klonopin for her anxiety, which she says is the only medication she has been able to tolerate. Tr. 69. She also takes Ambien to help her sleep at night. *Id.*

In response to questions from her attorney, Ms. Haman testified that she was diagnosed by Dr. Manning, a rheumatologist, with fibromyalgia back in 1998. Tr. 70. While she had been getting what she thought were bad sinus headaches since she was a child, Dr. Manning explained to her that they were migraines. Tr. 70. She now gets approximately seven to ten migraines a month. Tr. 70. Ms. Haman also explained that temperature extremes are very painful for her, and that in general she is in severe pain all the time:

> My fibromyalgia pain boosts to extreme pain to where I want to just cry. I literally don't know where to put myself. It hurts so bad, I just don't know what to do. I don't – siting, standing, laying down. I mean, I don't know. It's like it all depends on that very moment in my life of, you know, what – I can't even explain. The pain is just so severe. Just sitting here right now, I'm in a lot of pain. Because I don't know what to do with myself, I'm hurting so bad today. It's bad weather. It's just a bad day. It just doesn't even matter. It could be the middle of the Summer. It just, you know, everything affects me, extreme heat, extreme cold, anything.

Tr. 73. She also explained that her ankle injury has changed her whole life, including affecting her ability to get ready for the day quickly. Tr. 74. Her doctor has her do stretches every morning

to relax the tightness she wakes up with in her muscles. Tr. 75. She says her father comes over every day to assist her with laundry, groceries, and cooking. Tr. 75–76.

She then described getting arthritis and swelling in her hands, which prevents her from using her hands for cooking several days a week. Tr. 76–77. She explained that she can barely hold a phone to her ear or type on a computer, Tr. 77–78, and that her migraines prevent her from looking at computer screens. Tr. 78. She is not allowed out in the sun, she says, because of her medication. Tr. 78–79.

While Dr. Watsky was her primary physician, she was about to begin seeing a new doctor due to his retirement. Tr. 79. She also said that her fibromyalgia and arthritis symptoms are significantly worse to live with than her depression and anxiety symptoms. Tr. 79. She also described needing to keep her ankle elevated five to six hours a day to reduce swelling, as instructed by her doctor. Tr. 80. She also described symptoms of fatigue, reporting that she feels like she has "the flu every day of my life," but that with respect to all her symptoms her doctor told her that they had "exhausted all options for medications at this point" and that she has to "live with this pain." Tr. 81.

In response to questions from the ALJ, Ms. Haman clarified that Dr. Watsky was her primary doctor, that Dr. Formica is her primary rheumatologist, and that she had only seen Dr. Manning for a second opinion on her rheumatology. Tr. 84.

The ALJ then heard testimony from Mr. King, the vocational expert, who appeared by telephone and reviewed the portion of her file that related to her past work experience. Tr. 85. Mr. King stated that her past jobs were as a receptionist, DOT 637.367-038, sedentary, SVP-4, and as a sales clerk, DOT 290.477-014, light, SVP-3. Tr. 85–86.

The ALJ then posed a series of hypotheticals. Tr. 87–92. First, he asked the ALJ what jobs would be available to an individual of Ms. Haman's age, education, and past work experience who: (1) was limited to the light exertional level and would require a cane to walk, (2) was limited to occasional ramps and stairs and could never climb any ropes, ladders, or scaffolds; (3) could only occasionally balance, stoop, crouch, kneel, or crawl; (4) needed to avoid concentrated exposure to any moving mechanical parts and unprotected heights, as well as to extreme heat or cold; (5) was limited to performing only simple, routine, repetitive tasks; and (5) should avoid working with the public. Tr. 87. Mr. King testified that such an individual could not perform either of Ms. Haman's past relevant jobs, but that there were jobs at the light level available to them: (1) assembler – small parts, DOT 706.684-026, light, SVP-2, 1,538,900 jobs nationally; (2) mail sorter, DOT 209.687-026, light, SVP-2, 98,900 jobs nationally. Tr. 88. The ALJ asked if Mr. King's testimony was consistent with the DOT, and Mr. King clarified that it was, except that cane use and public contact were not discussed in the DOT, but that his conclusions were based on his thirty-five years of experience. Tr. 88–89.

In the second hypothetical, the ALJ added an additional limitation that the individual was limited to frequent handling and fingering bilaterally. Tr. 89. Mr. King said this limitation would rule out this individual's ability to hold the two previously-discussed jobs. *Id.*

In the third hypothetical, the ALJ asked Mr. King to assume all the same limitations as the first hypothetical, but with the individual limited to work at the sedentary exertional level. Tr. 89–90. Mr. King said that the following jobs were available to such an individual: (1) surveillance system monitor, DOT 379.367-010, sedentary, SVP-2, 89,600 positions nationally; (2) lens inserter, DOT 713.687-026, sedentary, SVP-2, 30,200 positions nationally; and (3) escort vehicle driver, DOT 919.663-022, sedentary, SVP-2, 92,900 positions nationally. Tr. 90.

Mr. King further clarified that all three jobs were sedentary by nature, sitting down, and that a cane would only be needed to get to the job. Tr. 91.

In the fourth hypothetical, the ALJ added the limitation of frequent handling and fingering bilaterally. Tr. 91. Mr. King responded that this additional limitation would leave the surveillance system monitor as the only job available to the individual. *Id.*

The ALJ then asked whether the individual would be precluded from the position and other jobs at the sedentary level if, because of pain symptoms and swelling in the lower extremities, that individual needed to take several unscheduled breaks to sit down or lie down and elevate one or both legs. Tr. 91. Mr. King said that such an individual would be precluded from that position insofar as the surveillance system monitor cannot be off-task for more than 3% of the time, as opposed to most jobs in which the acceptable off-task level is up to 10%. Tr. 92.

Finally, Ms. Haman's attorney asked what impact an absence rate of two days per month would have on the individual's employability in the ALJ's hypotheticals. Tr. 92. Mr. King responded that such an individual would be precluded from all compulsive employment, based on his thirty-five years of experience, because no employer would tolerate such a high absence rate. *Id.*

On April 26, 2017, the ALJ issued a written decision finding that Ms. Haman was not disabled under Title II or Title XVI. Tr. 12–28. Before proceeding to evaluate her applications, the ALJ applied the doctrine of *res judicata* to the period between the disability onset date and the date of ALJ Thomas's decision, February 19, 2013. Tr. 12–13.

At Step Two of the five-step disability determination, the ALJ found that Ms. Haman had the severe impairments of fibromyalgia, arthritis, status post right ankle fracture, depression,

PTSD, and anxiety, but that her additional medically determinable impairment of migraine headaches was non-severe. Tr. 15.

At Step Three, the ALJ found that Ms. Haman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 15.

At Step Four, the ALJ found that Ms. Haman had the residual functional capacity ("RFC") "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant would require a cane to walk, holding the cane to walk in her left non-dominant hand." Tr. 19. The ALJ found that she "can never climb ropes, ladders, or scaffolds," "can occasionally balance, stoop, crouch, kneel, and crawl," and "must avoid concentrated exposure to moving mechanical parts and unprotected heights" as well as "any extreme heat or extreme cold." *Id.* The ALJ further found that she was "limited to performing only simple, routine, and repetitive tasks," "should avoid working with the public," and "is limited to frequent fingering and handling, bilaterally." *Id.* In light of his assessment of Ms. Haman's RFC, the ALJ concluded she was unable to perform any of her past relevant work as a receptionist or sales clerk. Tr. 26.

At Step Five, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform":

> If the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.28 and Rule 201.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.

> The vocational expert testified that given all of these factors the individual would be able to perform the requirements of a representative occupation at the sedentary exertional level, as a surveillance systems monitor (DOT code: 379.367-010, SVP 2, an unskilled position) with 89,600 positions in the national economy.
>
> Although the vocational expert's testimony is inconsistent with the information contained in the Dictionary of Occupational Titles ("DOT"), there is a reasonable explanation for the discrepancy. The vocational expert testified that the DOT does not consider use of a cane when walking or a limitation of not working with the public. Instead of relying on the DOT regarding these limitations, the vocational expert testified that his testimony was based on his professional experience of 35 years (Hearing testimony; Exhibit B10E). The undersigned has determined that the vocational expert's explanation is reasonable and provides a reasonable basis for relying on the vocational expert's testimony rather than the information contained in the Dictionary of Occupational Titles *(See* SSR 00-4p).

Tr. 27. The ALJ therefore concluded Ms. Haman is capable of making a successful adjustment to other work that exists in significant numbers in the national economy and is therefore not disabled within the meaning of the Social Security Act. Tr. 27–28.

On May 11, 2017, Ms. Haman informed the SSA that she no longer wished to be represented by her attorney. Tr. 8.

On May 20, 2017, she requested review by the Appeals Council of the SSA, Tr. 278. She also attached a detailed letter of contentions as to errors by the ALJ, Tr. 378–81, including the following with respect to the testimony of the vocational expert:

> [The vocational expert] lost contact with the court during the hearing, who stated he was on a cell phone due to an outage and two feet of snow at his home, for about 10 to 15 minutes. When we got him back on the phone the judge quickly asked if he heard everything up to a certain point but provided him no update of what happened during those 10 to 15 minutes of his absence. The vocational expert sounded confused for a few seconds and then said yes which I do not think was handled properly. The accounts during that time period should have been provided to the vocational expert as he might have missed important information to my case. He

> claims there are 89,600 nationwide jobs that I can perform but I
> cannot travel due to my anxiety attacks and disabilities.

Tr. 378.

On September 15, 2017, the Appeals Council denied Ms. Haman's request for review.

SMF ¶ 9; Tr. 1–5.

### B. Procedural History

On Oct. 18, 2017, Ms. Haman, proceeding *pro se*, appealed the ALJ's decision denying her disability insurance benefits and supplemental security income. Compl. Her appeal was initially assigned to United States District Judge Janet C. Hall. *See* ECF Nos. 4–6.

That same day, Ms. Haman moved for leave to proceed *in forma pauperis* and for appointment of pro bono counsel. Motion for Leave to Proceed *in forma pauperis*, dated Oct. 18, 2017, ECF No. 2; Motion to Appoint Counsel, dated Oct. 18, 2017, ECF No. 3.

On Oct. 19, 2017, Magistrate Judge Joan G. Margolis granted Ms. Haman's motion for leave to proceed *in forma pauperis*. Electronic Order, dated Oct. 19, 2017, ECF No. 7.

On Jan. 19, 2018, the Acting Commissioner answered and filed the transcript of the administrative proceedings before the SSA. *See* Ans.; Tr.

On February 9, 2018, Ms. Haman again moved for appointment of counsel. Motion to Appoint Counsel, dated Feb. 9, 2018, ECF No. 18.

On February 14, 2018, this appeal was assigned to this Court. Order of Transfer, dated Feb. 14, 2018, ECF No. 19.

On February 22, 2018, Magistrate Judge Margolis denied Ms. Haman's motion for appointment of counsel. Ruling, dated Feb. 22, 2018, ECF No. 21.

On April 4, 2018, Ms. Haman moved for an extension of time to file dispositive motions, which the Court granted on April 5, 2018. Motion for Extension of Time, dated Apr. 4, 2018, ECF No. 24; Order, dated Apr. 5, 2018, ECF No. 25.

On June 13, 2018, counsel appeared for Ms. Haman and moved for a second extension of time to file dispositive motions. Notice of Appearance, dated Jun. 13, 2018, ECF No. 28; Motion for Extension of Time, dated Jun. 13, 2018, ECF No. 29.

On June 15, 2018, the Court granted Ms. Haman until August 29, 2018 to file a dispositive motion. Order, dated Jun. 15, 2018, ECF No. 30.

On August 26, 2018, Ms. Haman moved for a judgment on the pleadings reversing the Acting Commissioner's decision. Pl.'s Mot; Pl.'s Mem.

That same day, Ms. Haman filed a Statement of Material Facts with the Court. SMF.

On October 29, 2018, the Acting Commissioner moved for an order affirming her decision. Def.'s Mot.; Def.'s Mem. In her memorandum, the Acting Commissioner adopted the Statement of Material Facts as accurately stated. Def.'s Mem. at 2.

On November 13, 2018, Ms. Haman filed a reply to the Acting Commissioner's motion. Reply, dated Nov. 13, 2018, ECF No. 33.

On March 27, 2019, the Court ordered the case caption be amended to reflect that Ms. Berryhill is the named Defendant in this action. Order to Amend Case Caption, dated Mar. 27, 2019, ECF No. 34.

## II.    STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496,

501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also Moreau v. Berryhill*, No. 3:17-cv-396 (JCH), 2018 WL 1316197, at *3 (D. Conn. Mar. 14, 2018) ("Under section 405(g) of title 42 of the United States Code, it not a function of the district court to review *de novo* the ALJ's decision as to whether the claimant was disabled . . . . Instead, the court may only set aside the ALJ's determination as to social security disability if the decision 'is based upon legal error or is not supported by substantial evidence.'") (internal citation omitted) (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *accord Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) ("Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This is a "very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (quoting *Dickson v. Zurko*, 527 U.S. 150, 153 (1999)).

## III.   DISCUSSION

Ms. Haman argues that the ALJ erred (1) at Step Two, by finding her migraine headaches were non-severe; and (2) at Step Five, by finding that the job of surveillance system monitor matched her RFC. Pl.'s Mem. at 11–12, 7–11.

The Court disagrees that the ALJ erred at Step Two, but agrees that he erred at Step Five.

**A. Step Two**

Ms. Haman argues that the ALJ incorrectly concluded from the medical records that Ms. Haman "only intermittently complained of having migraines" and that she "only sought care for this condition on one occasion." Pl.'s Mem. at 11 (citing Tr. 15). She argues this analysis was wrong "as a matter of fact and law." *Id.*

The Acting Commissioner argues that "the record simply did not support a finding that Plaintiff's headaches were a severe impairment and Plaintiff failed in her burden to show that her headaches were a severe impairment," and that any error at Step Two is harmless "because the ALJ found that Plaintiff had other severe impairments and continued through the sequential analysis, and did not deny the claims based on the lack of a severe impairment alone." Def.'s Mem. at 6–7 (citations omitted).

The Court agrees with the Acting Commissioner that any error at Step Two is harmless as a matter of law.

A claimant seeking Social Security benefits must bear the burden of showing that the claimant has a medically severe impairment or combination of impairments. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). "The severity regulation requires the claimant to show that [the claimant] has an 'impairment or combination of impairments which significantly limits' 'the abilities and aptitudes necessary to do most jobs.'" *Id.* at 146 (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b)). It is the plaintiff's burden to provide "medical evidence which demonstrates the severity of her condition." *Merancy v. Astrue*, No. 10-cv-1982 (MRK)(WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012) (citing *Bowen*, 482 U.S. at 146).

At Step Two, if the ALJ finds any impairment to be severe, "the question whether the ALJ characterized any other alleged impairment as severe or not severe is of little

consequence." *Jones–Reid v. Astrue*, 934 F. Supp. 2d 381, 402 (D. Conn. 2012), *aff'd*, 515 F. App'x 32 (2d Cir. 2013) (quoting *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801 (6th Cir. 2003)); *see also Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) ("Step Two may do no more than screen out *de minimis* claims.") (citation omitted).

Here, the ALJ found that Ms. Haman's fibromyalgia, arthritis, status post right ankle fracture, depression, PTSD, and anxiety were severe impairments, and then proceeded with the sequential analysis, evaluating her RFC. Tr. 15. The ALJ also considered all of Ms. Haman's "medically determinable impairments" in evaluating Ms. Haman's RFC. Tr. 19 ("As required by SSR 96-8p, the residual functional capacity has been assessed based on all the evidence with consideration of the limitations and restrictions imposed by the combined effects."); *see* Tr. 15 (identifying the migraine headaches as a "medically determinable impairment" but finding it "non-severe").

As a result, any error in the ALJ's determination of the status of Ms. Haman's migraine headaches is harmless. *See O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) ("Because this condition was considered during the subsequent steps, any error was harmless."); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (finding harmless error where "the ALJ did identify severe impairments at step two, so that Stanton's claim proceeded through the sequential evaluation process. Further, contrary to Stanton's argument, the ALJ's decision makes clear that he considered the 'combination of impairments' and the combined effect of 'all symptoms' in making his determination.") (citing 42 U.S.C. § 423(d)(2)(B) (requiring consideration of "combined effect of all of the individual's impairments"); *accord* 20 C.F.R. § 404.1523.

### B. Step Five

Ms. Haman argues that the ALJ erred at Step Five by finding that a job proposed by the vocational expert—surveillance system monitor—was available to her, despite the fact that the ALJ found her RFC to be limited to performing "only simple, routine, and repetitive tasks." Pl.'s Mem. at 8 (citing Tr. 19).

Ms. Haman argues that the required General Educational Development ("GED") reasoning level[10] for the job of surveillance system monitor—which is 3, according to the *Dictionary of Occupational Titles* ("DOT")—is inconsistent with the ALJ's finding that her RFC is limited to performing simple, routine, and repetitive tasks. Pl's Mem. at 8 ("The reasoning level required involves several variables; as such, it is not simple."). In jobs classified as Reasoning Development Level 3, the worker must "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations." DOT, App'x C.

Ms. Haman contends instead that her RFC limitation to "simple, routine, and repetitive tasks" is more consistent with Reasoning Development Level 2. Pl.'s Mem. at 9–10. In jobs classified as Reasoning Development Level 2, the worker must "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." DOT, App'x C.

---

[10] General Educational Development ("GED") is distinct from SVP in that it "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." *General Educational Development (GED)*, DICTIONARY OF OCCUPATIONAL TITLES, App'x C (4th ed. 1991) [hereafter "DOT, App'x C"]. "This is education of a general nature which does not have a recognized, fairly specific occupational objective." *Id.* "Ordinarily, such education is obtained in elementary school, high school, or college." It also may be obtained, however, "from experience and self-study." *Id.* "The DOT's GED scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development, which each have five or six defined levels, with level 1 being the least demanding." *Polynice v. Colvin*, No. 8:12–CV–1381 (DNH/ATB), 2013 WL 6086650, at *17 (N.D.N.Y. Nov. 19, 2013).

Ms. Haman argues that this inconsistency between her RFC and the DOT listing for the surveillance system monitor position requires reversal, as the position "is in conflict with the hypothetical propounded by the ALJ and the decision is not, accordingly, based on substantial evidence." Pl.'s Mem. at 8. Ms. Haman further argues that the remand should be for recalculation of benefits only as no more development of the record is required. Pl's Mem. at 10–11.

The Acting Commissioner argues that "Plaintiff's RFC limitation to simple, routine, and repetitive tasks did not preclude her from performing the job of surveillance systems monitor." Def.'s Mem. at 5 (citation omitted). Further, the Acting Commissioner argues that even if there is a conflict, remand for recalculation is not appropriate "as further VE testimony could identify additional jobs that Plaintiff could perform." Def.'s Mem. at 6.

The Court agrees with Ms. Haman that the ALJ's error requires reversal—but not for recalculation of benefits. Instead, the Court finds remand is warranted only for further proceedings, in light of the apparent inconsistency between the DOT and Ms. Haman's RFC.

A claimant's RFC "is 'the most [he or she] can still do despite [his or her] limitations.'" *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting 20 C.F.R. § 416.945(a)(1)).

At Step Five, the ALJ considers the claimant's "residual functional capacity and [ ] age, education, and work experience" to evaluate whether the claimant "can make an adjustment to other work." 20 C.F.R. § 416.920(a)(4)(v). If the claimant is able to adjust to other work, then the ALJ will find the person not disabled; if the claimant cannot make the adjustment, the ALJ will find the person disabled. *Id.* While the claimant bears the burden for the first four steps of the disability determination, the burden shifts at Step Five. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Gonzalez ex rel. Guzman v. Dep't of Health & Human Servs.*, 360 F. App'x

240, 243 (2d Cir. 2010) ("Through the fourth step, the claimant carries the burdens of production and persuasion, but if the analysis proceeds to the fifth step, there is a limited shift in the burden of proof and the Commissioner is obligated to demonstrate that jobs exist in the national or local economies that the claimant can perform given his residual functional capacity.") (citing 68 Fed. Reg. 51155 (Aug. 26, 2003); *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)).

An ALJ may determine if there are a significant number of jobs available to a claimant either by applying the Medical Vocational Guidelines or by relying on the testimony of a vocational expert. *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). Furthermore, "[a]n ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion,' . . . and accurately reflect[s] the limitations and capabilities of the claimant involved[.]" *Id.* (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983) and citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)); *see also McAuliffe v. Barnhart,* 571 F. Supp. 2d 400, 406 (W.D.N.Y. 2008) ("I find, however, that because the hypothetical question posed to the vocational expert was not based on an accurate portrayal of plaintiff's impairments, the ALJ committed error in posing the hypothetical, and in relying on the vocational expert's answer to the hypothetical."); *Pardee v. Astrue*, 631 F. Supp. 2d 200, 222 (N.D.N.Y. 2009) ("Use of hypothetical questions to develop the vocational expert's testimony is also permitted, provided that the questioning precisely and comprehensively includes each physical and mental impairment of the claimant accepted as true by the ALJ.").

Ms. Haman argues that the Court should follow the holdings of the Ninth and Tenth Circuits on the issue of inconsistencies between an RFC limited to "simple, routine, and repetitive" tasks and a reasoning development level of 3 required for the jobs identified by the

vocational expert. Tr. 10; *see Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005)

(holding that plaintiff's RFC limiting her to "simple and routine work tasks," was "inconsistent

with the demands of level-three reasoning" required for the jobs of surveillance-system monitor

and call-out operator, and that this inconsistency required reversal and remand "to allow the ALJ

to address the apparent conflict[.]"); *Zavalin v. Colvin*, 778 F.3d 842, 847–48 (9th Cir. 2015)

(finding an "apparent conflict between the residual functional capacity to perform simple,

repetitive tasks, and the demands of Level 3 Reasoning," rejecting the Commissioner's argument

that "the DOT's reasoning levels correspond *only* to a person's level of education," finding that

"there is no rigid correlation between reasoning levels and the amount of education that a

claimant has completed" and that "the DOT's reasoning levels clearly correspond to the

claimant's *ability* because they assess whether a person can 'apply' increasingly difficult

principles of rational thought and 'deal' with increasingly complicated problems," and

concluding that remand was required because the failure to reconcile the apparent conflict was

not harmless).

The Acting Commissioner instead urges the Court to follow the holding of another

district court in the Second Circuit that has addressed this issue. Def.'s Mem. at 5 (citing

*McCusker v. Comm'r of Soc. Sec.*, No. 1:13-cv-1074 (GLS), 2014 WL 6610025, at *4–5

(N.D.N.Y. Nov. 20, 2014) (plaintiff's RFC finding limiting her to "sedentary work that is simple

and routine, with a specific vocational preparation (SVP) of one or two, and with only occasional

decision making and changes in the work setting" did not preclude her from the job of

surveillance system monitor).

That court cited, among other decisions, the Seventh Circuit's holding that there was no

apparent conflict. *See Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) ("A GED reasoning

score of three means that the claimant must be able to 'apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.' Tellingly, Terry does not argue that she cannot perform these skills, perhaps because the record suggests she can: she finished high school, completed training to become a certified nurse's assistant, and has the cognitive capacity to follow simple instructions.") (internal citations omitted).

The Seventh Circuit's holding also rested, in part, on SSR 00–4p, which it concluded "requires the ALJ to obtain an explanation only when the conflict between the DOT and the VE's testimony is 'apparent.'" *Id.* at 479 (citing *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)). "Because [the claimant] did not identify any conflict at the hearing, she would have to show that the conflict was 'obvious enough that the ALJ should have picked up on [it] without any assistance.'" *Id.*

The Second Circuit, however, has recently held that the SSR 00–4p requires the ALJ to identify and inquire into all apparent conflicts—even those that are not obvious. *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 92 (2d Cir. 2019) ("As the Fourth Circuit has persuasively explained, the Ruling mandates that whenever the Commissioner intends to 'rely[ ] on [a] vocational expert's testimony,' she must identify and inquire into all those areas 'where the expert's testimony *seems to* . . . conflict with the *Dictionary*.'") (quoting *Pearson v. Colvin*, 810 F.3d 204, 209 (4th Cir. 2015) (emphasis added by 2d Cir.)). "In other words, the Ruling requires the Commissioner to 'obtain a reasonable explanation' for any '*apparent*'—even if non-obvious—conflict between the *Dictionary* and a vocational expert's testimony." *Id.* (quoting SSR 00–4p); *see also id.* at 92 n.3 ("To the extent that other courts have understood the Ruling's reference to an "apparent conflict" to refer to a conflict that is "obvious," *see, e.g.*, *Gutierrez v.*

*Colvin*, 844 F.3d 804, 808–09 (9th Cir. 2016), we respectfully disagree for the reasons the Fourth Circuit has cogently articulated, *see Pearson*, 810 F.3d at 209–10.").

The Second Circuit held that teasing out such details and discrepancies "is precisely why the Commissioner bears an 'affirmative responsibility' to ask about 'any possible conflict between [vocational expert] evidence and information provided in" the DOT. *Lockwood*, 914 F.3d at 93 (citing SSR 00–4p). "Absent such an inquiry, the Commissioner lacks a substantial basis for concluding that no such conflicts *in fact* exist." *Id.* (citing *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1366 (11th Cir. 2018)). The Second Circuit further noted that this "affirmative duty" cannot be satisfied "by simply taking the [vocational expert] at his word that his testimony comports" with the DOT "when the record reveals an apparent conflict," or by asking "catch-all questions." *Id.* at 93–94 (citations omitted).

Here, the ALJ did not ask Mr. King, the vocational expert, about the apparent—even if non-obvious[11]—conflict between the DOT listing for surveillance systems monitor and Ms. Haman's RFC limitation to "simple, routine, and repetitive tasks." *See* Tr. 84–93; *see also, e.g.*, *McGinley v. Berryhill*, No. 17-cv-2182 (JGK)(RWL), 2018 WL 4212037, at *18 (S.D.N.Y. Jul. 30, 2018) (ALJ inquired further of VE and noted apparent conflict with DOT). Accordingly, this Court cannot determine whether the ALJ had a "substantial basis for concluding that no such conflicts *in fact* exist." *Lockwood*, 914 F.3d at 93.

---

[11] In a recent unpublished opinion, the Fourth Circuit joined the Ninth and Tenth Circuits in holding that an apparent conflict exists between a limitation to short and simple instructions and Reasoning Development Level 3 occupations, and that this conflict required a remand. *Keller v. Berryhill*, No. 17-2248, 2018 WL 6264813, at *4–5 (4th Cir. Nov. 29, 2018) (per curiam) ("We decide only that an apparent conflict exists between the VE's testimony and the DOT, and that the ALJ was obliged to resolve that apparent conflict with the VE's help. Because the ALJ failed to do so, however, the VE's testimony alone 'cannot provide substantial evidence' supporting the ALJ's fifth step finding . . . . We are therefore constrained to vacate and remand[.]"). The Fourth Circuit also called into doubt whether such conflicts are really "non-obvious," pointing to an internal SSA memorandum in the appellate record in which the agency's Director for the Division of Field Procedures "advises Regional Chief ALJs that an apparent conflict exists between a limitation to simple tasks and Reasoning Development Level 3 jobs" and "instruct[ing] administrative adjudicators to consider that apparent conflict in deciding benefits claims." *Id.* at *4.

Mr. King's testimony "cannot, then, represent substantial evidence capable of demonstrating" that Ms. Haman "can successfully perform work in the national economy." *Id.* at 94; *cf. Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (ALJ entitled to rely on an expert's opinion, notwithstanding certain "deviations from the Dictionary in such testimony," where those deviations do not actually conflict with the Dictionary); *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984) (SSA did not meet burden where jobs selected by vocational expert and relied up on by ALJ required RFC to perform light work, where claimant's RFC was for sedentary work).

"It may well be that the apparent conflict between [the vocational expert's] testimony and the *Dictionary* is susceptible to easy resolution[.]" *Lockwood*, 914 F.3d at 94. But it is not the Court's role "to speculate as to how or whether that conflict might have been resolved had the [Acting] Commissioner carried out her responsibility to probe such matters." *Id.*

Instead, the Court must "reverse and remand for further proceedings so that the Commissioner may have the opportunity to conduct the requisite inquiry in the first instance." *Id.*; *see Schaal*, 134 F.3d at 505 (where "application of the correct standard does not lead inexorably to a single conclusion . . . the proper course is to direct that this case be remanded to the SSA to allow the ALJ to reweigh the evidence . . . developing the record as may be needed."); *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999) ("Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.").

## IV.    CONCLUSION

For the reasons explained above, Ms. Haman's motion for judgment on the pleadings is **GRANTED IN PART AND DENIED IN PART**. Her motion is granted with respect to the

Acting Commissioner's Step Five finding, but denied with respect to the Acting Commissioner's Step Two finding. The Acting Commissioner's motion for an order affirming her decision is **DENIED**.

The decision of the Acting Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings as to Ms. Haman's Step Five determination, in accordance with this Ruling and Order.

The Clerk of the Court is respectfully directed to enter judgment for Ms. Haman, remand this case to the Acting Commissioner for rehearing and further proceedings in accordance with this Ruling and Order, and close this case.

The Clerk's Office is instructed that, if any party appeals to this court the decision made after the remand, any subsequent Social Security appeal is to be assigned to the undersigned.

**SO ORDERED** at Bridgeport, Connecticut, this 27th day of March, 2019.

                              /s/ Victor A. Bolden
                              Victor A. Bolden
                              United States District Judge